IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| International Industries Corporation, | ) | C/A No. 7:21-cv-00850-DCC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CR Brands, Inc., and Rust-Oleum | ) | **OPINION AND ORDER** |
| Consumer Brands Canada, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This matter is before the Court on Defendant CR Brands, Inc.'s ("CR Brands") Motion to Dismiss and Defendant Rust-Oleum Consumer Brands Canada's ("Rust-Oleum") Motion to Dismiss. ECF Nos. 9, 14. Plaintiff filed Responses in Opposition, and both Defendants filed Replies. ECF Nos. 21, 26, 27, 29. The Motions are now before the Court.

## **BACKGROUND**

The following statement of facts is drawn from the allegations of the Complaint. *See* ECF No. 1. For nearly 30 years prior to the events that gave rise to Plaintiff's claims, Plaintiff sold and distributed Mean Green cleaning products, manufactured by ChemPro, Inc. ("ChemPro"), pursuant to an agreement ("the Agreement") entered between Plaintiff and ChemPro in 1992. ECF No. 1 at 3. The Agreement appointed Plaintiff as "the sole and exclusive distributor and export manager" of ChemPro's Mean Green products outside the continental United States. *Id.* Plaintiff's distributing territory was later reduced to only Canada in a February 2002 letter modifying the Agreement. *Id.* at 5. The Agreement stated that "[ChemPro] will not solicit sales from or grant to any other person

any license or right identified herein in the territories specified . . . ."  ECF No. 1-1 at 3.

The initial term of the Agreement was for five years "unless sooner terminated as herein

provided, by mutual agreement or by operation of law."  *Id.*  The Agreement further stated:

> Sixty (60) days before the end of the fifth year measured as
> completed on the end of the same day of the same month on
> which this Agreement begins, either party may give written
> notice to the other of automatic renewal of the Agreement
> upon the same conditions existing in the first Term as may
> have been amended during the Term.  Otherwise, automatic
> renewal will take place if the aggregate sales for the first four
> years on the fourth anniversary date of this agreement divided
> by four equal to an average increase of 40% or more over the
> first year's sales.

*Id.* at 3–4.  ChemPro promised that "[u]pon expiration or termination of this Agreement,

[ChemPro] shall not (i) for a period of three (3) years therefrom solicit distributors of

[Plaintiff]; (ii) disclose or reveal any confidences or proprietary information regarding

[Plaintiff] and its operations, or customers to any person."  *Id.* at 7.  In addition, neither

party was permitted to "assign its rights or interests under this Agreement without the prior

written consent of the other.  Any such assignment without prior written consent shall be

void from the beginning and shall create no rights in favor of the purported assignee."

ECF Nos. 1 at 4; 1-1 at 7.  Notably, the Agreement states that it "shall be governed by the

laws of South Carolina" and that "[t]he parties agree to submit to the jurisdiction of the

courts of South Carolina in the event a dispute arises."  ECF No. 1-1 at 7.

By letter dated February 6, 2002, the parties agreed to modify the Agreement as

follows: (1) Plaintiff would relinquish its exclusive distribution rights to anywhere outside

of the continental United States, except that Plaintiff would retain such rights with respect

to Canada, and (2) the term of the Agreement was reduced from five years to three years.

ECF Nos. 1 at 5; 1-1 at 2.  Following this modification, the parties continued to render full, mutual performance of their obligations under the Agreement.  ECF No. 1 at 5.

In March 2006, Allied Capital, a private equity group, acquired ChemPro, but ChemPro remained its own separate legal entity.  *Id.*  Shortly after the acquisition, Allied Capital merged ChemPro with another business in its portfolio, Redox Brands, and the resulting post-merger entity became known as CR Brands.  *Id.*  After the merger, Plaintiff and CR Brands continued to mutually render performance under the Agreement, and on multiple occasions, ratified the continuing validity of the Agreement.  *Id.*  Thereafter, CR Brands was sold to two other private equity firms, once in 2009 and again in 2012, but on both occasions, maintained its separate corporate existence and continued to render performance under the Agreement with Plaintiff.  *Id.* at 6.  Throughout each of these corporate transactions, CR Brands continued to manufacture Mean Green products and Plaintiff continued to exercise its exclusive distribution rights in Canada.  *Id.*

On or about August 1, 2018, Plaintiff learned that CR Brands sold the Mean Green products brand to RPM International, Inc. ("RPM"), a multi-billion dollar holding company whose portfolio includes the Rust-Oleum brand of products.  *Id.*  Despite the sale, CR Brands assured Plaintiff that their relationship under the Agreement would continue.  *Id.*  Shortly thereafter, Plaintiff received correspondence from Rust-Oleum that Plaintiff no longer had any rights, exclusive or otherwise, to distribute Mean Green products in Canada.  *Id.* at 7.  When Plaintiff reminded Rust-Oleum of the existence of the Agreement with CR Brands, Rust-Oleum advised Plaintiff that it was terminating the Agreement effective December 1, 2018.  *Id.*  Plaintiff never consented to any written assignment of contractual rights to Rust-Oleum, nor did CR Brands ever send Plaintiff a letter to

terminate the Agreement. *Id.* Simultaneously, Plaintiff was advised by longstanding Canadian customers that Rust-Oleum representatives had informed them that Plaintiff was no longer their distributor for Mean Green products and that all distribution would be accomplished by Rust-Oleum. *Id.* As a result, Plaintiff began losing longstanding Canadian accounts. *Id.*

Plaintiff filed this lawsuit on March 24, 2021, alleging causes of action for a declaratory judgment, breach of contract, common law unfair trade practices, conversion, breach of the duty of good faith and fair dealing, and tortious interference with existing contractual relations against CR Brands. ECF No. 1 at 8–17. Plaintiff alleges only one cause of action for tortious interference with existing contractual relations against Rust-Oleum. *Id.* at 15–17. CR Brands and Rust-Oleum move for dismissal for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) and for failure to a state a claim on each of Plaintiff's causes of action pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF Nos. 9, 14.

## **APPLICABLE LAW**

**I. Federal Rule of Civil Procedure 12(b)(2)**

When "a district court rules on a Rule 12(b)(2) motion without conducting an evidentiary hearing or without deferring ruling pending receipt at trial of evidence relevant to the jurisdictional issue, but rather relies on the complaint and affidavits alone, 'the burden on the plaintiff is simply to make a prima facie showing of sufficient jurisdictional basis in order to survive the jurisdictional challenge.'" *In re Celotex Corp.*, 124 F.3d 619, 628 (4th Cir. 1997) (quoting *Combs*, 886 F.2d at 676). "If the existence of jurisdiction turns on disputed factual questions[,] the court may resolve the challenge on the basis of

4

a separate evidentiary hearing, or may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). When a defendant challenges the Court's personal jurisdiction under Rule 12(b)(2) after discovery has been conducted and the relevant evidence has been presented to the Court, the plaintiff has the burden of proving that jurisdiction exists by a preponderance of the evidence. *In re Celotex Corp.*, 124 F.3d at 628; *Grayson v. Anderson*, 816 F.3d 262, 269 (4th Cir. 2016). "In deciding whether the plaintiff has made the requisite showing, the court must take all disputed facts and reasonable inferences in favor of the plaintiff." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003) (citing *Mylan Labs, Inc. v. Akzo, N.V.*, 2 F.3d 56, 59–60 (4th Cir. 1993)). Additionally, "'[i]n reviewing the record before it, a court may consider pleadings, affidavits, and other evidentiary materials without converting the motion to dismiss to a motion for summary judgment.'" *Magic Toyota, Inc. v. Se. Toyota Distribs., Inc.*, 784 F. Supp. 306 (D.S.C. 1992) (quoting *VDI Techs. v. Price*, 781 F. Supp. 85, 87 (D.N.H. 1991)).

A federal court may exercise personal jurisdiction over a defendant in the manner provided by state law. Fed. R. Civ. P. 4(k)(1)(A). Thus, "for a district court to validly assert personal jurisdiction over a non-resident defendant, two conditions must be satisfied. First, the exercise of jurisdiction must be authorized by the long-arm statute of the forum state, and, second, the exercise of personal jurisdiction must also comport with Fourteenth Amendment due process requirements." *Christian Sci. Bd. of Dirs. of First*

*Church of Christ, Sci. v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001) (citing *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 134 (4th Cir. 1996)).

South Carolina's long-arm statute provides as follows:

> A court may exercise personal jurisdiction over a person who acts directly or by an agent as to a cause of action arising from the person's: (1) transacting any business in this State; (2) contracting to supply services or things in the State; (3) commission of a tortious act in whole or in part in this State; (4) causing tortious injury or death in this State by an act or omission outside this State if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this State; (5) having an interest in, using, or possessing real property in this State; (6) contracting to insure any person, property, or risk located within this State at the time of contracting; (7) entry into a contract to be performed in whole or in part by either party in this State; or (8) production, manufacture, or distribution of goods with the reasonable expectation that those goods are to be used or consumed in this State and are so used or consumed.

S.C. Code Ann. § 36-2-803(A). "South Carolina's long-arm statute has been interpreted to reach the outer bounds permitted by the Due Process Clause." *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 623 (4th Cir. 1997) (citations omitted). "Consequently, 'the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one.'" *Id.* (quoting *Stover*, 84 F.3d at 135–36). The central constitutional question the Court must address is whether the defendant has established "minimum contacts with [South Carolina] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

Viewed through this constitutional lens, personal jurisdiction may arise through specific jurisdiction, which is based on the conduct alleged in the lawsuit, or through general jurisdiction.  *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 292 n.15 (4th Cir. 2009).  Under general jurisdiction, when a defendant has "continuous and systematic" contacts with the forum state, the defendant "may be sued in [the forum] state for any reason, regardless of where the relevant conduct occurred."  *Id.* (citations omitted).  When the defendant is a corporation, "general jurisdiction requires affiliations 'so continuous and systematic as to render [the foreign corporation] essentially at home in the forum State,' *i.e.*, comparable to a domestic enterprise in that State."  *Daimler AG v. Bauman*, 571 U.S. 117, 159 n.11 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

### A.  General Jurisdiction

In recent years, the Supreme Court has significantly narrowed the reaches of general personal jurisdiction.  In *Daimler AG v. Bauman*, the Supreme Court clarified that general jurisdiction over corporate defendants will only exist in three circumstances: (1) in the forum where the defendant is incorporated; (2) in the forum where the defendant has its principal place of business; and (3) in a forum where a "corporation's affiliations with the [forum] are so continuous and systematic as to render [it] essentially at home in the forum State."  571 U.S. 117, 138–39 (2014) (internal quotations omitted).

### B.  Specific Jurisdiction

In contrast, under specific jurisdiction, a defendant may be sued in this Court if the litigation results from alleged injuries that arose out of or related to their contacts with South Carolina and those contacts were sufficient.  *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984).  To determine whether specific jurisdiction exists,

7

courts employ a "minimum contacts" analysis that examines: "(1) the extent to which the defendant purposefully avail[ed] itself of the privilege of conducting activities in the State; (2) whether the plaintiff['s] claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *ALS Scan, Inc. v. Dig. Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002) (internal quotations omitted).  Each prong must be satisfied.  *See Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278–79 (4th Cir. 2009).

This analysis focuses on the relationship between the defendant, the forum, and the litigation; therefore, the Supreme Court has emphasized "[t]wo related aspects of this necessary relationship."  *Walden v. Fiore*, 571 U.S. 277, 284 (2014).  "First, the relationship must arise out of contacts that the defendant *himself* creates with the forum State."  *Id.* (internal quotation omitted) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).  "Second, [the] minimum contacts analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there."  *Id.* (internal quotation omitted) (citing *Int'l Shoe Co.*, 326 U.S. at 319).

Once it has been determined that a defendant has purposefully availed itself of the privilege of doing business in the forum state, a court should consider the following factors: "(1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and (5) the interests of the states in furthering substantive social policies." *Consulting Eng'rs*, 561 F.3d at 279 (citing *Burger King*, 471 U.S. at 477).

## II. Federal Rule of Civil Procedure 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits the dismissal of an action if the complaint fails "to state a claim upon which relief can be granted." Such a motion tests the legal sufficiency of the complaint and "does not resolve contests surrounding the facts, the merits of the claim, or the applicability of defenses . . . .  Our inquiry then is limited to whether the allegations constitute 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (internal quotation marks and citation omitted).  In a Rule 12(b)(6) motion, the Court is obligated to "assume the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).  However, while the Court must accept the facts in a light most favorable to the nonmoving party, it "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments."  *Id*.

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the complaint must state "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Although the requirement of plausibility does not impose a probability requirement at this stage, the complaint must show more than a "sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint has "facial plausibility" where the pleading "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

## DISCUSSION

### I.  CR Brands' Motion to Dismiss

#### A.  Jurisdiction

Because discovery on this issue has not been completed, the Court reviews this jurisdictional challenge under the prima facie standard.  *See In re Celotex Corp.*, 124 F.3d 619, 628 (4th Cir. 1997).  In its Motion to Dismiss, CR Brands contends the Court lacks general personal jurisdiction.  It is undisputed that CR Brands is incorporated under the laws of the State of Delaware and maintains its principal place of business in Ohio.  ECF Nos. 1 at 2; 9 at 17.  As such, the only way this Court can have general personal jurisdiction over CR Brands is if its contacts with South Carolina are so continuous and systematic as to render it essentially at home in South Carolina.  *See Daimler AG*, 571 U.S. at 139.

Plaintiff contends CR Brands "engaged in regular, continuous, systematic, and voluminous business with Plaintiff, in South Carolina, for thirteen years."  ECF No. 21 at 13.  In contrast, CR Brands claims Plaintiff's allegation is insufficient to satisfy its burden of establishing jurisdiction.  ECF No. 9 at 17.  Specifically, CR Brands relies on *Maseng v. Lenox Corp.*, 483 F.Supp.3d 360, 368 (D.S.C. Apr. 16. 2020), which noted that the Supreme Court in *Daimler* "rejected the assertion that general jurisdiction could be exercised in every State in which a corporation engages in a substantial, continuous, and systematic course of business." (internal quotation marks omitted).

Having reviewed the arguments and submissions of the parties, the Court finds that Plaintiff has failed to show that CR Brands' contacts with South Carolina are so continuous and systematic as to render it essentially at home in South Carolina.  *See Daimler AG*, 571 U.S. at 139.  While CR Brands does not provide any sworn testimony

from a representative with information regarding its lack of contacts with South Carolina, the Court finds Plaintiff's allegations in the Complaint fail to establish anything other than that CR Brands continued to perform business transactions with Plaintiff following the ChemPro merger with Redox Brands in 2006.  Accordingly, the Court finds that it does not have general jurisdiction over CR Brands.  Therefore, the Court turns to the question of specific jurisdiction.

CR Brands contends the Court lacks specific personal jurisdiction because the causes of action alleged in the Complaint do not arise out of any activities conducted in South Carolina.  ECF No. 9 at 15.  Instead, CR Brands claims Plaintiff's alleged harm resulted from CR Brands' ceasing to manufacture and sell its Mean Green products to Plaintiff for distribution in Canada.  *Id.*  CR Brands further argues that because the Complaint fails to plausibly allege that CR Brands was bound by the Agreement containing a South Carolina forum selection clause, Plaintiff fails to establish specific personal jurisdiction on this basis as well.  *Id.* at 16.

On the other hand, Plaintiff contends that (1) CR Brands is the successor-by-merger to ChemPro, which was based in Spartanburg, South Carolina and entered into the Agreement in dispute with Plaintiff nearly 30 years ago; (2) the Agreement explicitly contains a South Carolina forum selection clause; and (3) CR Brands has consistently affirmed the validity and rendered performance of the Agreement until its breach.  *See* ECF No. 21 at 11–12.

Having reviewed the arguments and submissions of the parties, the Court finds Plaintiff has established specific personal jurisdiction over CR Brands.  As will be discussed further below, Plaintiff has sufficiently alleged at this procedural posture that

CR Brands was bound by the Agreement, originally entered into with ChemPro, when it sold the Mean Green products brand to RPM in 2018. As a result, Plaintiff sufficiently alleges that CR Brands has purposefully availed itself of the privilege of conducting business in South Carolina through deliberately engaging in long-term business with Plaintiff and contractually agreeing that the laws of this State would govern disputes. *See Consulting Eng'rs*, 561 F.3d at 278 (providing a nonexclusive list of factors for courts to consider whether a defendant has engaged in purposeful availment). Further, Plaintiff's claims arise out of CR Brands' longstanding business relationship of selling and the eventual discontinuation of the sale of Mean Green products to Plaintiff in South Carolina. Lastly, the exercise of personal jurisdiction over CR Brands in this case would be constitutionally reasonable because South Carolina's interest in adjudicating the dispute, Plaintiff's interest in obtaining convenient and effective relief, and the state's interest in obtaining efficient resolution of disputes outweigh any burden on CR Brands to litigate in this forum. *See Consulting Eng'rs*, 561 F.3d at 279 (outlining several factors the court should consider to ensure the appropriateness of the forum). Indeed, CR Brands has not alleged any considerations that would render jurisdiction unreasonable. *See Burger King*, 471 U.S. at 477 ("[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."). Therefore, the Court finds Plaintiff has made a prima facie showing of sufficient jurisdictional basis. Accordingly, the Court has specific personal jurisdiction over CR Brands.

### B.  Breach of Contract

CR Brands contends Plaintiff failed to state a claim for breach of contract because the Complaint fails to allege sufficient facts to establish the existence of a contract between the parties.  ECF No. 9 at 6.  Specifically, CR Brands argues that it was never a party to and never owed any contractual manufacturing or distribution obligations to Plaintiff under the Agreement.  *Id.* at 7.  CR Brands further asserts that Plaintiff failed to establish that CR Brands was ChemPro's successor-in-interest following the merger and assumed its obligations under the Agreement with Plaintiff.  *Id.*  In fact, CR Brands claims the Agreement naturally expired in 2005 because Plaintiff accepted a renewal term of only three years in the February 2002 letter modifying the terms of the Agreement.  *Id.* at 8.  Thus, CR Brands maintains that the Agreement was no longer in effect when ChemPro merged to form CR Brands in 2006.  *Id.*

Even if the Agreement remained in effect, CR Brands contends the Agreement did not continue to automatically renew every three years, as Plaintiff suggests.  *Id.* at 9.  Instead, because the Agreement provides for renewal only under two conditions, and neither of those conditions were met, CR Brands argues the Agreement expired in 2005 and was not in effect at the time of the alleged breach in 2018.  *Id.* at 9–10.

In contrast, Plaintiff contends that since 2005, and after ChemPro became CR Brands, the parties continued to render mutual performance under the Agreement and affirmed the continuing validity of the Agreement.  ECF No. 21 at 4.  As a result, Plaintiff claims there were continuing automatic renewals of the Agreement, and the Agreement remained in effect at the time of CR Brands' breach in 2018.  *Id.*  Notably, CR Brands does not dispute that the parties continued rendering mutual performance under the

Agreement until 2018. *Id.* Thus, at a minimum, Plaintiff argues an implied-in-fact contract exists between the parties giving rise to a breach of contract claim. *Id.*

Having reviewed the arguments and submissions of the parties, the Court finds Plaintiff has stated a claim for breach of contract. "To recover for a breach of contract, the party asserting the claim must allege and prove: 1) a binding contract entered into by the parties; 2) breach or unjustifiable failure to perform the contract; and 3) damage suffered by the claiming party as a direct and proximate result of the breach." *Davies v. WTD Holdings, Inc.*, C.A. No. 3:19-cv-02122-JMC, 2020 WL 1703895, at *2 (D.S.C. Apr. 8, 2020).

First, Plaintiff sufficiently alleged that the Agreement entered with ChemPro in 1992, and modified in 2002, continued in effect so as to bind CR Brands following the merger in 2006.[1] Even if the written Agreement expired in 2005, as CR Brands claims, the Court finds Plaintiff sufficiently alleged, at the motion to dismiss stage, the existence of an implied-in-fact contract between the parties because CR Brands continued to perform under the terms of the Agreement until 2018. *See CSX Transp., Inc. v. Baltimore & Annapolis R.R. Co.*, C.A. No. 4:15-cv-01014-RBH, 2017 WL 2264869, at *3 (D.S.C. May 24, 2017) ("If, after expiration of a contract, the parties to the contract continue to perform under the contract's terms, the parties' relationship is generally governed by a

---

[1] With respect to CR Brands' argument that the Agreement did not continue to automatically renew every three years, the Court finds that, based upon a plain reading of the letter, the modification is equally susceptible to an interpretation that the renewal term was amended from five years to three years and that the remaining terms of the Agreement continued, as evidenced by the parties' mutual performance under the Agreement until the sale of the Mean Green products brand to RPM in 2018.

new, implied in fact contract that incorporates the terms, or substantially the same terms, of the expired contract." (quoting 17A Am. Jur. 2d *Contracts* § 17)).

Second, Plaintiff's allegation that CR Brands discontinued manufacturing and selling Mean Green products to Plaintiff following a sale of the brand to RPM in 2018 satisfies the breach requirement for a breach of contract claim.

Third, Plaintiff properly alleged that CR Brands' breach of the Agreement caused direct and proximate damages to Plaintiff through its loss of business in Canada. Therefore, the Court finds Plaintiff sufficiently alleged the elements of a breach of contract claim.[2]  Accordingly, CR Brands' Motion to Dismiss is denied as to this claim.

### C. Common Law Unfair Trade Practices

CR Brands contends Plaintiff's "common law unfair trade practices" claim must be dismissed because such cause of action does not exist under South Carolina law.  ECF No. 9 at 10.  CR Brands claims that the South Carolina Unfair Trade Practices Act ("SCUTPA") usurped any common law cause of action to the extent that it ever existed. *Id.* at 11.  However, because Plaintiff does not allege any cause of action under SCUPTA, CR Brands argues the claim must be dismissed.

---

[2] CR Brands does not raise any specific arguments regarding Plaintiff's claim for breach of the duty of good faith and fair dealing.  Nevertheless, for the reasons stated above, the Court denies CR Brands' Motion as to this claim.  "[T]here exists in every contract an implied covenant of good faith and fair dealing.  However, the [implied covenant] is not an independent cause of action separate from the claim for breach of contract.  Instead, the [implied covenant] should be viewed 'as merely another term of the contract at issue.'"  *King v. Carolina First Bank*, 26 F.Supp.3d 510, 518 (D.S.C. June 6, 2014) (internal citations omitted).  Plaintiff alleges that CR Brands' wrongful conduct breached the implied covenant of good faith and fair dealing of the Agreement, which resulted in significant financial damages.  Accordingly, the Court finds Plaintiff has alleged a breach of the implied covenant of good faith and fair dealing claim sufficient to survive a motion to dismiss.

Plaintiff, on the other hand, maintains that there is authority contrary to CR Brands' position which reveals that a common law unfair trade practices claim has been recognized in South Carolina. *See, e.g.*, *Muhler Co. v. Window World of N. Charleston LLC*, C.A. No. 2:11-cv-00851-DCN, 2014 WL 4269078, at *4 n.1 (D.S.C. Aug. 28, 2014) (noting that a cause of action for common law unfair trade practices shares common elements with the Lanham Act) (citing *Shakespeare Co. v. Silstar Corp. of Am., Inc.*, C.A. No. 3:90-1695-DWS, 802 F.Supp. 1386, 1399 (D.S.C. Sept. 24, 1992), *rev'd on other grounds*, 9 F.3d 1091 (4th Cir. 1993)); *Pizzeria Uno Corp. v. Temple*, C.A. No. 82-1218-CHH, 566 F.Supp. 385, 393–94 (D.S.C. Apr. 8, 1983) (same); *Taylor v. Hoppin' Johns, Inc.*, 405 S.E.2d 410, 412 (S.C. Ct. App. 1991) (noting the trial court held appellants liable under a theory of common law unfair trade practices).

Having reviewed the arguments and submissions of the parties, the Court finds Plaintiff has failed to state a claim for common law unfair trade practices. Because the elements for a cause of action for common law unfair trade practices share common elements with the Lanham Act, the Court has considered those elements and finds Plaintiff failed to allege sufficient facts in the Complaint to establish the claim.[3] Plaintiff

---

[3] Under the Lanham Act, a plaintiff must establish that

> (1) the defendant made a false or misleading description of fact or representation of fact in commercial advertisement about his own or another's product; (2) the misrepresentation was material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its product.

alleges only that it developed the Mean Green brand in Canada, including generating marketing material at its own expense, and CR Brands' sale of the Mean Green products brand to RPM destroyed Plaintiff's business in Canada.  There is no allegation that CR Brands made any false or misleading statement or representation about the Mean Green product.  Therefore, CR Brands' Motion to Dismiss is granted as to this claim.

### D.  Tortious Interference with Existing Contractual Relations

CR Brands contends Plaintiff's tortious interference with existing contractual relations claim should be dismissed because the Complaint does not identify any specific customer with whom CR Brands allegedly interfered.  ECF No. 9 at 11.  CR Brands claims that the Complaint must identify a specific customer with whom Plaintiff had a specific contract and with which CR Brands interfered.  *Id.* at 12.  Instead, CR Brands asserts that because Plaintiff only provides general allegations about mystery Canadian customers, it failed to state a claim.  *Id.* at 13.

Plaintiff emphasizes that CR Brands relies on case law from other jurisdictions regarding the purported "specific customer" requirement and fails to cite any South Carolina state or federal decision in support of this proposition.  *See* ECF No. 21 at 9. Regardless, Plaintiff argues that it has expressly alleged the following: (1) that Plaintiff was the sole and exclusive distributor of CR Brands' Mean Green products in Canada; (2) that Plaintiff served in this capacity for nearly 30 years; (3) that CR Brands was in possession of Plaintiff's Canadian customer list; (4) that CR Brands gave Plaintiff's customer list to Rust-Oleum or its parent corporation for the explicit purpose of taking the Canadian market away from Plaintiff; and (5) that Rust-Oleum has done so.  *Id.*

---

*Muhler*, 2014 WL 4269078, at *2–3 (citing *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 272 (4th Cir. 2002)).

Having reviewed the arguments and submissions of the parties, the Court finds Plaintiff has failed to state a claim for tortious interference with a contract. "In South Carolina, the elements for tortious interference with contract are: 1) the existence of a contract; 2) knowledge of the contract; 3) intentional procurement of its breach; 4) the absence of justification; and 5) resulting damages." *Poly-Med, Inc. v. Novus Sci. Pte. Ltd.*, C.A. No. 8:15-cv-01964-JMC, 2018 WL 3996294, at *4 (D.S.C. Aug. 21, 2018) (internal quotation marks omitted). Although Plaintiff has alleged the existence of a contract between it and CR Brands, as discussed above, Plaintiff has not alleged the existence of a contract between it and any of its purported Canadian customers with which CR Brands allegedly interfered.[4] Instead, Plaintiff alleges that it maintained longstanding business relationships with customers in Canada, and after CR Brands sold the Mean Green products brand to RPM in 2018, Plaintiff's customers were diverted to Rust-Oleum as their Mean Green products distributor. Because the first element of the claim has not been satisfied, the Court need not address the remaining elements necessary to establish a claim for tortious interference with a contract. Accordingly, CR Brands' Motion to Dismiss is granted as to this claim.

---

[4] Alternatively, if Plaintiff intends for its tortious interference claim against CR Brands to be based on the existence of its Agreement between the parties, rather than a contract between Plaintiff and its Canadian customers, the Court notes that such a claim will not lie because CR Brands is ostensibly a party to the Agreement. *See Callum v. CVS Health Corp.*, 137 F.Supp.3d 817, 861 (D.S.C. Sept. 29, 2015) (noting tortious interference with contractual relations claims "require a plaintiff to show the defendant was a stranger to both the contract at issue and the business relationship giving rise to and underpinning the contract").

### E. Remaining Claims

Neither party addresses Plaintiff's claim for a declaratory judgment in their briefing. Regardless, the Court denies CR Brands' Motion to Dismiss as to this claim because Plaintiff has alleged facts showing a substantial controversy between the parties. *See Brown-Thomas v. Hynie*, 412 F.Supp.3d 600, 606 (D.S.C. Sept. 12, 2019) ("Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)); *id.* ("Generally speaking, however, a motion to dismiss is rarely appropriate in a declaratory judgment action." (citing *Palmer v. Audi of Am., Inc.*, 2015 WL 2221727, at *2 (D. Md. Jan. 13, 2015)) (internal quotation marks omitted)).

Similarly, CR Brands does not make any specific arguments regarding Plaintiff's conversion claim. Upon review, the Court finds that Plaintiff has alleged facts sufficient to state a claim for conversion. "Conversion is the unauthorized assumption and exercise of the right of ownership over goods or personal chattels belong[ing] to another, to the alteration of the condition or the exclusion of the owner's rights." *Gillins v. Celadon Trucking Servs., Inc.*, C.A. No. 2:16-cv-00795-DCN, 2016 WL 4455018, at *6 (D.S.C. Aug. 24, 2016) (quoting *Hennes v. Shaw*, 725 S.E.2d 501, 508 (S.C. Ct. App. 2012)). "To establish the tort of conversion, the plaintiff must establish either title to or right to the possession of personal property." *Id.* Here, Plaintiff alleges that its distribution rights conveyed in the Agreement to sell and distribute Mean Green products in Canada were wrongfully assumed in the sale of the brand to RPM, dispossessing Plaintiff of its ability

to perform under the Agreement and depriving Plaintiff of any value. The Court finds Plaintiff has sufficiently alleged a right of ownership over the exclusive distribution rights to sell Mean Green products in Canada and that those rights are identified in the Agreement. Accordingly, the Court finds Plaintiff has alleged facts sufficient to state a claim for conversion at this procedural posture and denies CR Brands' Motion to Dismiss as to this claim.

## II. Rust-Oleum's Motion to Dismiss

### A. Jurisdiction

Because discovery on this issue has not been completed, the Court reviews this jurisdictional challenge under the prima facie standard. *See In re Celotex Corp.*, 124 F.3d 619, 628 (4th Cir. 1997). In its Motion to Dismiss, Rust-Oleum contends the Court lacks general personal jurisdiction. It is undisputed that Rust-Oleum is incorporated under the laws of Canada and maintains its principal place of business in Ontario, Canada. ECF Nos. 1 at 2; 14-1 at 2. As such, the only way this Court can have general personal jurisdiction over Rust-Oleum is if its contacts with South Carolina are so continuous and systematic as to render it essentially at home in South Carolina. *See Daimler AG*, 571 U.S. at 139.

Plaintiff does not make any specific argument that general personal jurisdiction exists over Rust-Oleum. Accordingly, the Court finds that Plaintiff has failed to show that Rust-Oleum's contacts with South Carolina are so continuous and systematic as to render it essentially at home in South Carolina. *See Daimler AG*, 571 U.S. at 139. Rust-Oleum provides the affidavit of Maurice Lobreau, Vice President and General Manager of Rust-Oleum Canada. ECF No. 14-2. He avers that Rust-Oleum is a general partnership registered under the laws of the Province of Ontario with its principal place of business in

Ontario, Canada. *Id.* at 2. He states that Rust-Oleum is the only part of RPM that handles the sale and distribution of Mean Green products in Canada and no other part of RPM is involved in any way nor has any contact with customers in Canada about Mean Green products. *Id.* Mr. Lobreau further states that Rust-Oleum has no employees in South Carolina, has no property in South Carolina, has never solicited business in South Carolina, and has not had any in-person contact with Plaintiff in South Carolina. *Id.* at 2–3. He also maintains that Rust-Oleum transacts no business in South Carolina, operates exclusively in Canada, and has only sold or distributed Mean Green products to customers in Canada. *Id.* at 3. As Plaintiff has not provided any specific argument that general personal jurisdiction exists over Rust-Oleum, the Court looks to the Complaint, which fails to set forth any allegations that Rust-Oleum's contacts with South Carolina are so continuous and systematic as to render it essentially at home in South Carolina. Accordingly, the Court finds that it does not have general jurisdiction over Rust-Oleum. Therefore, the Court turns to the question of specific jurisdiction.

Rust-Oleum contends the Court lacks specific personal jurisdiction because Rust-Oleum has no contacts with South Carolina and the conduct alleged by Plaintiff occurred in Canada rather than South Carolina. *See* ECF No. 14-1 at 5. In contrast, Plaintiff argues specific jurisdiction exists because the Agreement was purportedly assigned to Rust-Oleum in CR Brands' sale of assets to RPM, thereby binding Rust-Oleum to resolving disputes in South Carolina courts under the forum selection clause. ECF No. 26 at 6. Alternatively, Plaintiff claims that Rust-Oleum engaged in tortious activity directed against Plaintiff in South Carolina. *Id.*

Having reviewed the arguments and submissions of the parties, the Court finds that Plaintiff has failed to demonstrate that specific jurisdiction exists over Rust-Oleum. *See Walden*, 571 U.S. at 284 (holding that claims to which specific jurisdiction will attach "must arise out of contacts that the 'defendant himself' creates with the forum state" (quoting *Burger King*, 471 U.S. at 475)).  Specifically, Plaintiff has neither alleged purposeful conduct in South Carolina sufficient to hale Rust-Oleum into court here nor has it supported its allegations with evidence of jurisdictional facts.  Instead, Plaintiff only claims that Rust-Oleum began selling Mean Green products to Plaintiff's Canadian customers in violation of the Agreement, and when Plaintiff notified Rust-Oleum of the issue, Rust-Oleum attempted to terminate the Agreement.  Plaintiff also contends Rust-Oleum intentionally contacted Plaintiff's Canadian customers and advised them that Plaintiff was no longer their distributor for Mean Green products.   None of these allegations establish that Rust-Oleum has purposefully availed itself of the privilege of conducting activities in South Carolina.  *See Walden*, 571 U.S. at 284 (noting the minimum contacts analysis looks to the defendant's contact with the forum state itself). Therefore, because there is no evidence to indicate that Rust-Oleum has "created a substantial connection to the forum state by action purposefully directed toward the forum state or otherwise invoking the benefits and protections of the laws of the state," Plaintiff has failed to make a prima facie showing of sufficient jurisdictional basis.  *Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939, 945–46 (4th Cir. 1994); *see In re Celotex Corp.*, 124 F.3d at 628.  Accordingly, Plaintiff has failed to establish this Court has general or specific jurisdiction over Rust-Oleum, and the claim against it must be dismissed.

**B. Tortious Interference with Existing Contractual Relations**

Even if the Court were to assume that it has jurisdiction over Rust-Oleum in this case, Plaintiff has failed to state a claim for tortious interference with a contract against Rust-Oleum. As discussed above, Plaintiff failed to allege the existence of a contract between it and its purported Canadian customers with which Rust-Oleum allegedly interfered. Even assuming that Plaintiff has alleged the existence of such a contract, Plaintiff failed to allege the terms of the contract, how those terms were breached, that Rust-Oleum intentionally procured the breach of those terms, and how Rust-Oleum's actions were not justified. *See Rollins Ranches, LLC v. Watson*, C.A. No. 0:18-cv-03278-SAL, 2021 WL 5355650, at *11 (D.S.C. Nov. 17, 2021). Instead, Plaintiff only claims that Rust-Oleum received Plaintiff's Canadian customer list from CR Brands following the sale of the Mean Green products brand to RPM; that Rust-Oleum contacted Plaintiff's customers, informed them that Plaintiff no longer distributes Mean Green products, and told them that Rust-Oleum would be their distributor; and that when Plaintiff reminded Rust-Oleum of its Agreement with CR Brands, Rust-Oleum attempted to terminate the Agreement. These facts fail to state a claim for tortious interference with a contract.

## <u>CONLUSION</u>

For the reasons set forth above, Defendant CR Brands' Motion to Dismiss [9] is **DENIED IN PART AND GRANTED IN PART** and Defendant Rust-Oleum's Motion to Dismiss [14] is **GRANTED**.

IT IS SO ORDERED.

s/ Donald C. Coggins, Jr.
United States District Judge

March 15, 2022
Spartanburg, South Carolina